UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | File No. 15-CR-187 (SRN/FLN) |
| Plaintiff, | |
| v. | MEMORANDUM OPINION & ORDER |
| Erik Becerra, a/k/a Christopher Turner, | |
| Defendant. | |

Bradley M. Endicott, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for the Government.

Manvir K. Atwal, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis MN 55415, for Defendant

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Report and Recommendation ("R&R") of Magistrate Judge Franklin L. Noel dated September 19, 2017 [Doc. No. 84]. In the R&R, Magistrate Judge Noel recommends that this Court: (1) deny Defendant's Motion to Suppress Statements, Admissions and Answers [Doc. No. 61]; (2) deny Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 62]; and (3) terminate Defendant's *pro se* Motion to Dismiss [Doc. No. 77]. Defendant filed Objections to the R&R [Doc. No. 90], and the Government filed a Response to Defendant's Objections [Doc. No. 93]. The Court has reviewed *de novo* those portions of the R&R to which Defendant objects, as required by 28 U.S.C. § 636(b)(1) and Fed. R.

Crim. P. 59(b)(3). Based on that review, the Court adopts the magistrate judge's R&R in its entirety, denies both motions to suppress, and terminates the *pro se* Motion to Dismiss.

## I.     BACKGROUND

On June 17, 2015, Defendant was charged by indictment with one count of being a felon in possession of a firearm and one count of being a felon in possession of ammunition, both in violation of 18 U.S.C. § 922(g)(1) and § 924(e). (Indictment, Counts 1–2 [Doc. No. 10].) The underlying details of the charges—as well as the procedural history of this case—are set forth more fully in the R&R, which this Court incorporates herein by reference. (*See* R&R at 1–4.)

On May 5 2015, Defendant drove to the Brooklyn Center Probation Department ("BCPD") seeking to relinquish to his probation officer a gun and bullets he had found under the front seat of the vehicle he was driving. (*Id.* at 4.) Defendant parked, left the gun in the vehicle, put the bullets in his pocket, and went inside the BCPD. (*Id.*) After listening to Defendant, Bobbi Harrington, his probation officer, called 911. (*Id.*) She sought to have Defendant arrested, stating that she believed he was under the influence of methamphetamine, which constituted a violation of his supervised release. (*Id.*)

The dispatcher sent Brooklyn Center Police Officer Brian Burtus to the scene. (*Id.*; July 7, 2017 Mots. Hr'g Tr. ("Mots. Hr'g") at 5 [Doc. No. 76].) Based on information from Harrington, Burtus learned from the dispatcher that Defendant was a gang member, has a history of weapons, was not violent, and that "they wanted [Burtus] to take him into custody . . . for a parole violation for methamphetamine use." (Mots. Hr'g at 8, 40–41; R&R at 4.)

Burtus was told that Harrington requested an Apprehension and Detention Order ("A&D").[1] (Mots. Hr'g at 7, 14.) Burtus arrived at the BCPD and waited for his partner. (*Id.* at 13.) The two then approached the building and were met outside by another probation officer, Deanne Schultz, whom Burtus observed was "extremely nervous and excited." (*Id.* at 13–14.) Schultz again mentioned Defendant's gang history and told the officers that "[Defendant] more than likely has a gun on him right now." (*Id.* at 14.)

When the officers finally entered the building, Burtus saw Defendant sitting on a chair in the lobby talking to Harrington. (*Id.* at 15.) Burtus observed a bulge in Defendant's coat pocket, and became "concerned that it could be a firearm." (*Id.*) Burtus then approached Defendant and told him that he was under arrest. (*Id.* at 16.) When Burtus arrested Defendant, Burtus had not yet received a copy of the A&D. (*Id.* at 38–39.)

As Burtus was handcuffing Defendant, Defendant began talking about the car he had driven and parked outside. (*Id.* at 17.) Defendant told Burtus, "I have something in my car." (*Id.*) Without issuing *Miranda* warnings, Burtus then asked, "what's in your car," to which Defendant responded "a gun."[2] (*Id.* at 17, 47–48.) Burtus then asked Defendant if he had any weapons or anything illegal in his person. (*Id.* at 17, 48.) Defendant responded that he had bullets in his pocket. (*Id.* at 18.) Burtus proceeded to search Defendant, and retrieved from his person a plastic bag containing bullets as well as the key to the car Defendant had

---

[1] According to Burtus, if an individual violates probation or parole, a probation officer can request an A&D for that individual, which is akin to a warrant and enables the police to make an arrest. (Mots. Hr'g at 7; 36.)

[2] In his Objection, Defendant contends that the magistrate judge erroneously found that Defendant "told the officer that he had 'a gun' in the car as soon as he was handcuffed." (Def's Obj. at 1.) Although this Court does not read that factual finding into the R&R, here it parses out in detail the exchange between Burtus and Defendant.

parked outside. (*Id.* at 18–19.) Defendant was taken to the back seat of the squad car, (*id.* at 19, 49), and the car that Defendant was driving was then searched without a warrant. (*Id.* at 22, 49.) A handgun was found underneath the front driver's seat of the car. (*Id.* at 22.) At some point later that day, the car was towed pursuant to the Brooklyn Center Police Department towing policy. (*Id.* at 27–28.)

Burtus testified about Defendant's demeanor during the arrest. He indicated that although Defendant was "talkative and rambling[,] . . . there was nothing that appeared to be out of the ordinary with him." (*Id.* at 20.) In fact, Burtus testified that Defendant was very cooperative, not agitated, did not appear to be under the influence, and that up to the time of his arrest, Burtus did not perceive Defendant to be mentally unstable or paranoid. (*Id.* at 20–21, 55.)

After searching the car and retrieving the gun, Burtus left the BCPD with Defendant in the back seat of the squad car. (*Id.* at 30.) Burtus drove about a block and parked. (*Id.*) He then read Defendant the *Miranda* warnings from a card. (*Id.*) Defendant told Burtus that he understood his rights and would talk to him. (*Id.* at 31–32, 52.) Defendant then relayed the details of how he got the vehicle the night before his arrest and how he had found the gun and bullets in the car. (*Id.* at 32.) Although Burtus noted that Defendant's story "[wa]s a little odd," at no point in the conversation did Burtus develop concerns that Defendant might have a mental impairment or might be under the influence of controlled substances. (*Id.* at 33.) In fact, Burtus indicated that Defendant was "cooperative" throughout the interrogation. (*Id.*)

The day after Defendant's arrest, Police Detective Terry Olson commenced his investigation of the case. (*Id.* at 58.) Olson obtained and executed a search warrant for a DNA sample from Defendant. (*Id.*) After he collected the DNA sample, Olson read Defendant another set of *Miranda* warnings. (*Id.* at 60.) Defendant indicated that he understood his rights and was willing to speak with Olson. (*Id.* at 58.)  Olson testified that during the interrogation, Defendant "was very polite" and, although he "rambled at times," was cooperative. (*Id.* at 60.) According to Olson, Defendant neither appeared to be under the influence of controlled substances nor appeared to have a mental impairment. (*Id.* at 61.) However, by the end of his interaction with Defendant, Olson had developed a concern that paranoia was a "potential issue" for Defendant. (*Id.* at 69.)

Following these events and the indictment, Defendant filed a motion for a psychiatric evaluation to determine if he was competent to stand trial, which this Court granted. (R&R at 2; June 30, 2015 Order [Doc. No. 15].)  After the evaluation, on October 27, 2015, the magistrate judge held a competency hearing, and concluded that Defendant was not mentally competent to stand trial. (R&R at 2; Oct. 27, 2015 Order [Doc. No. 20].) Shortly thereafter, the magistrate judge ordered that Defendant be involuntarily medicated, pursuant to *Sell v. United States*, 539 U.S. 166 (2003), to determine if he could be rendered competent to stand trial. (R&R at 2.) Defendant then underwent several months of treatment and evaluation, and at a hearing held on March 29, 2017, the magistrate judge concluded that his mental condition had so improved as to render him competent to stand trial, so long as he maintains his current medication protocol. (R&R at 3; March 29, 2017 Order [Doc. No. 46].)

Thereafter, Defendant filed the underlying motions to suppress and a *pro se* Motion to Dismiss.³ Defendant first seeks to suppress evidence obtained as a result of search and seizure. (*See* Doc. No. 62.) He argues that his warrantless arrest violated his Fourth Amendment rights because it was not supported by probable cause. (Def.'s Mem. Support Mots. Suppress ("Def.'s Mem.") at 8–12 [Doc. No. 78].) Accordingly, he argues that the evidence the police found—the bullets inside his pocket and the gun inside the vehicle—should be suppressed as the "fruit" of his unlawful arrest. (*Id.* at 12–14.)

Second, Defendant moves to suppress any statements, admissions, and answers that he made to Burtus and Olson. (*See* Doc. No. 61.) He first argues that the statements he made while being handcuffed must be suppressed because they were elicited through custodial interrogation but without the benefit of *Miranda* warnings. (Def.'s Mem. at 15–16.) He also seeks to suppress the statements he made to Burtus on May 5 and Olson on May 6 after receiving *Miranda* warnings on the ground that he did not voluntarily, knowingly, and intelligently waive his rights. (*Id.* at 16–20.)

The magistrate judge recommended the denial of both of Defendant's suppression motions and the termination of his *pro se* motion.⁴ (*See* R&R at 5–13.) The magistrate judge found that the officers had probable cause to arrest Defendant. (*Id.* at 5.) Thus, because Defendant was lawfully arrested, the magistrate judge concluded that evidence retrieved

---

³ The *pro se* motion seeks to dismiss on various grounds and to join in Defendant's counsel's arguments. (R&R at 3.)

⁴ After Defendant filed his *pro se* motion, defendant's counsel advised the magistrate judge that Defendant wishes to continue to be represented by counsel and understands that the court will not consider his *pro se* motion if he is represented. (R&R at 12.) The magistrate judge thus concluded that the *pro se* motion should be terminated without further analysis. (*Id.* at 13.)

6

from his person—bullets and a car key—was the product of a permissible search incident to a lawful arrest. (*Id.* at 10.) Moreover, the magistrate judge concluded that the warrantless search of the car, which produced the gun, was permissible under three independent exceptions to the warrant requirement: (1) the automobile exception; (2) the exigent circumstances exception; and (3) and the inevitable discovery doctrine. (*Id.* at 10–11.)

With respect to Defendant's statements, the magistrate judge likewise found no basis for suppression. (*Id.* at 8–9.) First, the magistrate judge assumed, without deciding, that any statement Defendant made while being handcuffed was a product of officer questioning. (*Id.* at 8.) However, the magistrate judge concluded that pursuant to the public safety exception of *New York v. Quarles*, 467 U.S. 649 (1984), any statement Defendant made during his arrest, although a product of custodial interrogation without *Miranda* warnings, was not suppressible. (*Id.*) Second, the magistrate judge found that Defendant had voluntarily waived his *Miranda* rights on May 5 and 6. (*Id.* at 9.)

In his Objection, Defendant re-argues the points he made before the magistrate judge. Defendant reasserts that his arrest was unlawful because there was no warrant or A&D and there was no probable cause. (Def.'s Obj. at 2–4.) Second, he argues that the *Quarles* public safety exception is inapplicable. (*Id.* 4–5.) Finally, he incorporates wholesale his prior arguments regarding suppression of the *Mirandized* statements he made to Burtus and Olson on May 5 and 6, respectively. (*Id.* at 5.)

## II. DISCUSSION

The district court must undertake an independent, *de novo* review of those portions of the R&R to which Defendant objects and "may accept, reject, or modify, in whole or in

7

part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); *see also* D. Minn. LR 72.2(b)(3).

### A. Probable Cause to Arrest

Defendant first challenges the magistrate judge's finding that Burtus had probable cause to believe Defendant was violating his supervised release conditions and may have been under the influence of methamphetamine and carrying a weapon. (Def.'s Obj. at 2.) Specifically, he contends that the limited information Burtus obtained from the 911 dispatcher, combined with Schultz's speculation that Defendant may have a weapon and Burtus's own observation of the bulge in Defendant's pocket, is insufficient to support a finding of probable cause. (*Id.* at 3.)

This Court disagrees. "Probable cause for an arrest exists when the totality of circumstances demonstrates that the arresting officer personally knows or has been reliably informed of sufficient facts to warrant a belief that a crime has been committed and that the person to be arrested committed it." *United States v. Reinholz*, 245 F.3d 765, 778 (8th Cir. 2001) (citing *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999)). Here, Burtus had probable cause to arrest Defendant because he received reliable information from two probation officers to warrant a belief that Defendant had committed a crime. This information was further corroborated by Burtus's own observation—immediately after being told Defendant likely had a weapon—of a bulge in Defendant's front pocket.[5]

---

[5] Defendant argues that under Eighth Circuit precedent, a bulge in a suspect's clothing does not give the police probable cause to arrest. (Def.'s Obj. at 3 (citing *United States v. Jones*, 254 F.3d 693, 697 (8th Cir. 2001), *United States v. Eustaquio*, 198 F.3d 1068, 1071 (8th Cir. 1999), and *United States v. Tovar-Valdivia*, 193 F.3d 1025, 1028 (8th Cir.

8

First, based on information from Harrington, Burtus learned on his way to the BCPD that Defendant was possibly under the influence of methamphetamine and had a history of gang involvement and firearms. Second, Schultz, whom Burtus noted was "extremely nervous and excited"—uncharacteristically so based on Burtus's experience working with probation officers—told Burtus outside of the BCPD that Defendant "likely had a weapon on him." (Mots. Hr'g at 14.) Combined with the bulge that Burtus immediately observed in Defendant's front pocket, this information renders "the totality of the circumstances at the time of the arrest '[] sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'" *Borgman v. Kedley*, 646 F.3d 518, 523 (8th Cir. 2011) (quoting *Fisher v. Wal–Mart Stores, Inc. et al.*, 619 F.3d 811, 816 (8th Cir. 2010)). Thus, this Court concludes that Defendant's arrest was lawful because it was supported by probable cause.

### B. Application of Quarles to un-*Mirandized* Statements

Defendant next challenges the magistrate judge's application of the *Quarles* public safety exception to the statements he made while being handcuffed. (Def.'s Obj. at 4.) Specifically, he argues that: (1) the police "were not confronted with an immediate necessity of ascertaining the whereabouts of the gun;" (2) "the gun did not actually pose a threat to public safety;" (3) "Burtus did not need to ask 'What is in your car' to protect the public from safety"; and (4) "there was no exigency demanding Burtus ask 'What's in your car?'" because Defendant was already handcuffed. (*Id.*)

---

1999).) However, those cases are inapposite, as there the police officers claimed that there was probable cause primarily, or even solely, on grounds that there was a bulge in the defendants' clothing.

9

This Court again agrees with the magistrate judge that the *Quarles* public safety exception applies to this case such that the statements Defendant made while being handcuffed may not be suppressed as "illegal fruits of a *Miranda* violation." 467 U.S. at 660. In *Quarles*, the U.S. Supreme Court established a "public safety" exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence. *Id.* at 655. The Court reasoned that "the doctrinal underpinnings of *Miranda* [do not] require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety." *Id.* at 656. In facts analogous to this case, the *Quarles* defendant was charged with criminal possession of a weapon. *Id.* at 651. After handcuffing the defendant inside a supermarket, police officers asked him where the gun was, to which he replied, "the gun is over there." *Id.* at 652. The trial court suppressed the gun and the defendant's statements because he was not issued *Miranda* warnings before being questioned, but the U.S. Supreme Court reversed, applying the public safety exception. *Id.* at 655–56.

Here, like in *Quarles*, police officers asked "questions reasonably prompted by a concern for public safety." *United States v. Watters*, 572 F.3d 479, 482 (8th Cir. 2009) (quoting *Quarles*, 467 U.S. at 655). Before Burtus and his partner entered the BCPD, an extremely nervous and excited probation officer told the officers that Defendant "likely ha[d] a gun on him." (Mots. Hr'g at 14.) Burtus then observed a bulge in Defendant's coat pocket, which Burtus testified "had [him] concerned that it could be a firearm," (*id.* at 15), "an immediate threat to an officer," (*id.* at 12), the probation officers, and any other

10

bystanders, including Defendant.[6] (*Id.* at 15.) But what is more, Burtus did not ask Defendant any questions until Defendant stated he had something in his car. (*Id.* at 17.) Under those circumstances, Burtus's follow-up questions were reasonably prompted by a concern for public safety and not "designed solely to elicit testimonial evidence from a suspect." *Watters*, 572 F.3d at 482 (quoting *Quarles*, 467 U.S. at 659). In fact, Burtus "asked only the question necessary to locate the missing gun before advising [Defendant] of his rights. It was only after securing the loaded [gun] and giving the [*Miranda*] warnings that he continued with investigatory questions . . . ." *Quarles*, 467 U.S. at 659.

Defendant's contention that *Quarles* is distinguishable is unavailing. This Court rejects his claims that the police officers did not face an immediate necessity of ascertaining the whereabouts of the gun or that the gun did not actually pose a threat to public safety. (Def.'s Obj. at 4.) Indeed, like in *Watters*, which applied the *Quarles* exception, Burtus had information that Defendant might have a gun and had a history of firearms. *See* 572 F.3d at 483. With the potential gun's "whereabouts unknown, it obviously posed more than one danger to the public: an accomplice might make use of it," *Quarles*, 467 U.S. at 657, or someone might come upon it in the process of towing the car. Thus, like the magistrate judge, this Court concludes that the un-*Mirandized* statements Defendant made while being arrested should not be suppressed.

---

[6] On this point, it's important to note that in *Quarles*, the Supreme Court held that "the availability of the [public safety] exception does not depend upon the motivation of the individual officers involved." 467 U.S. at 656. Thus, if anything, Burtus's subjective concern for public safety only strengthens the application of *Quarles*.

11

### C. Waiver of *Miranda* Rights

Finally, Defendant objects to the magistrate judge's conclusion that he validly waived his *Miranda* rights at his May 5 and May 6 interrogations. (Def.'s Obj. at 5.) Incorporating in full the arguments he made before the magistrate judge, he contends here that his mental impairments—which were recognized by the magistrate judge just a few months after the interrogations—rendered him unable to understand the nature of the right he was abandoning and the consequences of doing so. (Def.'s Mem. at 16–20.) Furthermore, he argues that his condition—which he contends the officers were aware of when they interrogated him—together with the manner in which Burtus and Olson structured their custodial interrogations, "overwhelmed [his] will to resist police questioning and rendered his *Miranda* waivers involuntary." (*Id.* at 18.)

To be valid, a *Miranda* waiver must be made "voluntarily, knowingly and intelligently." *United States v. Jones*, 23 F.3d 1307, 1313 (8th Cir. 1994) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). There are two dimensions of a valid waiver:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). A waiver will be deemed involuntary if the individual's will was overborne. *United States v. Castro-Higuero*, 473 F.3d 880, 886 (8th Cir. 2007) (quoting *United States v. Syslo*, 303 F.3d 860, 866 (8th Cir. 2002)). With respect to the second prong—whether the waiver was "knowingly and

intelligently" made—the Eighth Circuit has found a waiver to be valid even when the defendant claimed to be "impaired by a low I.Q., PCP intoxication, and mental illness." *United States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998). Particularly relevant here, in *Turner*, the Eighth Circuit rejected claims that mental illness impaired a defendant's waiver, noting that "although Turner later exhibited 'bizarre' behavior and may have exhibited signs of mental illness, the change in behavior does not show that at the time of his confession he lacked the mental capacity to waive his rights." *Id.* at 556.

Based on a detailed review of the record and an independent examination of the May 5 and May 6 interrogations, this Court concludes that Defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights both times. Here, there is no evidence to suggest that the officers used intimidation, coercion, or deception during their respective interrogations of Defendant. In fact, their tone remained conversational throughout, and when giving Defendant the *Miranda* warnings, Olson stopped after each warning to ask Defendant if he understood. (Gov't Ex. 9: 1:49–2:14 [Doc. No. 69].) Olson also asked Defendant if he had any questions and if he wanted to talk to him about why he got arrested. (*Id.*) With respect to Defendant's contention that Olson threatened him by stating, "[y]ou have to comply with the process. If you don't, I'll take you to the hospital and do a blood draw," (Def.'s Mem. at 19), this statement was not a threat, but rather an explanation of the instructions contained in the search warrant authorizing Olson to obtain the DNA sample. (Gov't Ex. 9: 0:30.)

This Court also concludes that Defendant's waiver was knowing and intelligent. Although both officers testified that at times Defendant "rambled," (Mots. Hr'g at 15), and

13

that his story was "a little odd," (*id.* at 33), and Defendant highlights that he sometimes slurred his words, was "disorganized and, often, nonsensical," (Def.'s Mem. at 18–19), this does not rise to the level of an unknowing and unintelligent waiver. *See, e.g.*, *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011) (holding *Miranda* waiver to be valid despite defendant's inability to read or write because a "somewhat diminished capacity . . . due to a mental defect" will not render a *Miranda* waiver invalid absent evidence of police coercion). In sum, this Court concludes that Defendant validly waived his *Miranda* rights at his May 5 and May 6 interrogations.

### III.   ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED that:**

1. Magistrate Judge Noel's R&R of September 19, 2017 [Doc. No. 84] is **ADOPTED**;

2. Defendant's Objections [Doc. No. 90] to the R&R are **OVERRULED**;

3. Defendant's Motion to Suppress Statements, Admissions and Answers [Doc. No. 61] and Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Doc. No. 62] are **DENIED**; and

4. Defendant's *pro se* Motion to Dismiss [Doc. No. 77] is **TERMINATED**.


Dated: November 13, 2017         s/Susan Richard Nelson
                                 SUSAN RICHARD NELSON
                                 United States District Judge